UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

NR, by her legal guardian, NAIMA RUSSELL,

    Plaintiff,

     v.

THE CITY OF NEW YORK; Detective PATRICK J.
BURNETT, and Officer FREDERICK E. ALLEYNE,
in their individual and official capacities,

    Defendants.

**COMPLAINT
AND JURY DEMAND**

---

  NAIMA RUSSELL, on behalf of Infant Plaintiff "NR", by their attorneys, LAW

OFFICES OF JAMES HENNING & ASSOCIATES, PLLC, respectfully alleges, upon

information and belief, as follows:

## INTRODUCTION

1) The parents of children of color are all too familiar with the essential yet uncomfortable

conversation that has colloquially been dubbed "The Talk."[1] This refers to a discussion that

these parents must have with their children about how to safely conduct themselves when

interacting with police officers to avoid being perceived with bias or suspicion because of

their race. The prevalence of The Talk has been thoroughly explored by peer reviewed

scholarship, particularly within the context of highly publicized instances of police related

violence that resulted in the killings of black children such as Trayvon Martin and Tamir

Rice.[2] The Talk is an exemplification of the fear and anxiety that has increasingly gripped the

---

[1] See generally, Anderson, L. A., O'Brien Caughy, M., & Owen, M. T. (2021). "The Talk" and Parenting While
Black in America: Centering Race, Resistance, and Refuge. *Journal of Black Psychology*, *48* (3-4), 475-506.
https://doi.org/10.1177/00957984211034294 (Original work published 2022).
[2] Id.

parents of children of color—a collective nightmare that through no fault of their own, their children may be subjected to police violence or even death.

2) On June 3, 2025, that nightmare was realized for Infant Plaintiff "NR" and her legal guardian[3], Plaintiff Naima Russell.

3) That evening, NR—a black child who had never had substantive contact with the police—left the safety of her apartment to walk a few short blocks to meet her friend at the subway station.

4) NR never made it to the station. Just minutes after she left home she was forcibly detained by a pair of large, strange men in civilian clothing. Without explanation, the men grabbed NR and dragged her into a building she had never been inside before.

5) Because these men failed to identify themselves, NR was unaware that they were police officers who had reportedly concluded that she was a mentally ill *adult*.

6) Naima had warned NR about another nightmare contemplated by parents—child abduction. Naima had instructed NR to "make a scene" if anyone attempted to abduct her.

7) At just over one hundred pounds, NR was no physical match for the two hostile men who seemed determined to kidnap her. Although she was unable to break free from her attackers, she screamed for help and pleaded for someone to call her mother. Alerted by the girl's cries, a crowd gathered. At least one spectator heard NR shout Naima's phone number and called to inform her that her child was being forcefully dragged away against her will.

8) Naima heard NR's cries in the background of the call and rushed into the night to find and protect her child.

---

[3] While Naima is NR's legal guardian rather than biological parent, she has cared for NR since she was two years old, and the bond between the two is that of mother and child. NR openly refers to Naima as her mother.

9) Before the growing crowd of concerned citizens, the two men who had taken hold of NR forced her into an unfamiliar building and seemed intent on secluding her from the spectators' presence inside of an elevator. The men wrestled NR to the ground, using physical force to suppress her movements and her breathing while they awaited the elevator's arrival.

10) Although the spectators were unable to persuade NR's captors to stop harming the girl, their presence guided Naima to the location where her child was being attacked.

11) Even after Naima arrived and identified herself as NR's mother, the two unidentified men continued to forcibly restrain her child. When they finally relented and revealed themselves to be police officers, Naima requested their identification.

12) Only one of the two officers provided any information in response to Naima's request. However, it is indisputable that the name and badge number he wrote down and handed to Naima were not his own. Upon information and belief, the information he provided was entirely fabricated.

13) After Naima reunited with her traumatized child, she brought NR with her to the 75th Precinct along with members of their family to seek an explanation and formally complain about the officers' misconduct. At the precinct, NR experienced pain and difficulty breathing and had to be rushed to the Emergency Room.

14) While at the hospital, Naima and NR's nightmare continued. Naima received the first of a series of disconcerting contacts by New York City Police Department ("NYPD") personnel about the incident. Upon information and belief, rather than seeking to investigate the misconduct of Detective Patrick Burnett and Officer Frederick Alleyne—NR's two

assailants—the City officials that contacted Naima were working to conceal said misconduct and intimidate the officers' already traumatized victims.

15) Naima Russell, on behalf of NR, brings the present action to seek monetary compensation for the damages her child suffered and continues to suffer because of the misconduct of the City and its agents and officials.

## JURISDICTION AND VENUE

16) This action arises under 42 U.S.C. §§ 1983 and 1988.

17) This Court may exercise supplemental jurisdiction over the State law causes of action herein.

18) Venue is proper under 28 U.S.C. § 1391.

19) On June 4, 2025, Plaintiff served the City of New York timely notice of the present claims, in accordance with N.Y. Gen. Mun. Law § 50-e. On June 9, 2025, Plaintiff amended their notice.[4] A hearing pursuant to N.Y. Gen. Mun. Law § 50-h was held on August 8, 2025.

20) More than 90 days have elapsed since submission of Plaintiff's notice of claim and their 50-h hearing, and Defendant City has not settled the instant claim.

21) Plaintiff has duly complied with all the conditions precedent to the commencement of this action.

## THE PARTIES

22) NAIMA RUSSELL, is a resident of the State of New York and of the United States, residing in BROOKLYN, New York. She is the legal guardian of NR ("Infant Plaintiff" or "Plaintiff").

23) Infant Plaintiff, NR, was born on April 4, 2009. She is a resident of the State of New York and of the United States, residing in BROOKLYN, New York.

---

[4] While the Comptroller's Office sent written acknowledgement of Plaintiff's initial Notice of Claim, no acknowledgement of the amended Notice has been received.

24) Defendant, CITY OF NEW YORK ("City"), is a municipal corporation in the State of New York and a resident of the Eastern District of New York. Kings County is a subdivision of the City.

25) Defendant, DETECTIVE PATRICK J. BURNETT (Shield No.: 1509) ("Burnett"), was at all relevant times a detective employed by the NYPD, acting within the scope of his authority and under color of law, unless otherwise specified. He is named in his individual and official capacities.

26) Defendant, OFFICER FREDERICK E. ALLEYNE (Shield No.: 312) ("Alleyne") was at all relevant times an officer[6] employed by the NYPD, acting within the scope of his authority and under color of law, unless otherwise specified.[7] He is named in his individual and official capacities.

27) The New York City Police Department ("NYPD") is an agency of the City.

28) Employees of the NYPD are agents and employees of the City.

29) The City is legally responsible for torts that NYPD employees commit within the scope of their employment or under color of law.

## STATEMENT OF FACTS

30) Infant Plaintiff NR is a sixteen-year-old student who has never been in legal trouble nor had any substantive contact with law enforcement before June 3, 2025.

31) NR weighs approximately 103 pounds and stands approximately 5'3". Before June 3, 2025, NR had not experienced anxiety issues and was a happy, outgoing child with a normal appetite.

---

[6] Alleyne's business card, provided by the 75th Precinct, indicates the title of "officer," however an internet query of Alleyne's badge number states that he is a detective.
[7] Alleyne, together with Burnett, are hereinafter the "Individual Defendants." The Individual Defendants, together with City, are hereinafter the "Defendants."

32) At 9:11 PM on June 3, 2025, NR left her apartment building at 487 Livonia Avenue to walk approximately two blocks to the Junius Street subway station, to meet a friend and return to her apartment for a sleepover they had planned.

33) Mere minutes after NR walked out of her apartment building, two middle-aged men in civilian clothing, one of whom was at least 6'1" and 215 pounds, grabbed her and began forcefully dragging her off of the street.

34) Because they failed to identify or explain themselves, NR did not know that these men, Patrick Burnett and Frederick Alleyne, were NYPD officers who were purportedly under the mistaken belief that she was a mentally ill *adult* whose mother had reported her missing. NR believed that these random men were kidnapping her.

35) As NR struggled against her would-be abductors and screamed for help, they dragged her towards 463 Livonia Avenue, a residential apartment building she had never entered before.

36) NR protested, identified herself by name and cried out for help as the men continued to manhandle her. They attempted to silence NR by covering her mouth, but her cries attracted passersby, and a crowd of onlookers began to assemble. Although NR had never met any of these onlookers before, she yelled out her name and Naima's telephone number and pleaded for someone to alert her mother.

37) Assisted by Burnett, Alleyne forcibly shoved NR through the first of two sets of entrance doors to 463 Livonia Avenue, pulling up the child's clothing and exposing her undershirt while he tussled with her. Alleyne then pinned NR's arms behind her back as he thrust her through the second set of doors and into the lobby.

38) Burnett and Alleyne then dragged the visibly terrified child through the lobby of the building, and over to the elevators, where they repeatedly pressed the elevator call button.

39) Realizing that she was about to be secreted in an elevator with her assailants, NR continued her attempts to escape them.

40) Undeterred by NR's efforts or the growing crowd, the men wrestled NR to the floor of the building with such force that she was pulled out of the pajama slippers and head covering she was wearing.

41) Alleyne then physically pinned NR against the floor next to the elevator, placing his weight on top of her. Alleyne shoved his knee into NR's side while pressing his forearm into the back of her neck.

42) Having assumed a grappling position against NR, Alleyne then isolated her right arm and wrenched the child's torso using both hands while leveraging her against his knee, constricting her breathing while Burnett assisted in immobilizing her left arm.

43) When NR protested to the officers that she could not breathe, Alleyne callously responded that she *could* and continued the gratuitous employment of force against her.

44) Some of the bystanders had followed NR, Burnett, and Alleyne into the lobby. Taking note of NR's persistent protestations, some onlookers began to insist that it appeared the men had the wrong person. At least one proposed *calling the police.*

45) The spectators were met with defiant shouts and apparent threats from Burnett and Alleyne. Alleyne shook his head at bystanders who asked him to let NR free or be less forceful with the child.

46) Burnett and Alleyne repeatedly demanded that the spectators not get involved and back off. Although NR continued to identify herself by name and protest that she lived at 487 Livonia Avenue, Burnett and Alleyne shouted to onlookers that NR was a "crazy" runaway who lived at 463 Livonia Avenue.

47) When a spectator requested the name of the person Burnett and Alleyne were looking for, Burnett falsely insisted that NR had *confirmed* her identity as the runaway they sought and bellowed to the worried onlookers: "It's her! It's her! She told me her name!" to which the captive Naima screamed "It's not!"

48)  Following this exchange, Burnett yelled back to the crowd that NR was "lying."

49) One of the onlookers was able to telephone NR's guardian, Naima Russell, and report what was happening to her child. Naima could hear NR screaming in the background during the call and knew that NR was in trouble, having left the safety of their apartment just minutes prior.

50) Panic stricken, Naima ran out of her apartment and towards the station to find and help NR. However, before she made it to the station, she saw the commotion at 463 Livonia Avenue.

51) As Officer Alleyne continued to grapple NR against the floor of the building, Naima rushed into the lobby of 463 Livonia Avenue and identified herself to the two strange men who were "on top of" her child.

52) NR cried out for Naima, who told Burnett and Alleyne that NR was *her child* and not a runaway or missing person. Even then, Alleyne persisted in holding NR on the ground with both hands tightly and painfully squeezing her arm. Naima later recounted that she felt "powerless."

53) After realizing that they had violently detained a *child* who was not the *adult* they were reportedly seeking, Burnett and Alleyne finally released NR without apology or remorse.

54) Naima asked the officers to identify themselves. Video footage demonstrates that Burnett wrote down "Detective Orton 75 Det Squad" and the shield number "2304" on a slip of paper that he handed to Naima. Alleyne provided Naima with no information whatsoever.

55) After Burnett provided Naima with his purported name and badge number, he waved away uniformed officers that were arriving to the scene as backup, and then hastily departed the building with Alleyne.

56) The information Burnett provided was neither his real name nor his true badge number. Upon information and belief, this name and badge number were fictitious, as no Detective Orton appears in relation to an internet query of this badge number, nor does any Detective Orton appear to be currently employed by the NYPD at all.

57) Burnett's apparent act of providing a false name and badge number is a violation of NYPD protocol. Burnett is aware of this policy, and his supervisors at the NYPD are aware of his questionable history in complying with it, because of successive civilian complaints in November and September of 2020 that Burnett failed to provide his identifying information.

58) At some point after NR's traumatic encounter with police, Naima Russell spoke with the mother of the person Burnett and Alleyne were reportedly looking for, who lived in an apartment at 463 Livonia Avenue. Naima was shown a photograph demonstrating that there was no resemblance between the woman Burnett and Alleyne allegedly concluded and NR.

59) That night, Naima brought NR to the 75th Precinct accompanied by family members, to make a formal complaint about the egregious and unlawful actions of Detective Burnett and Officer Alleyne.

60) When the family asked to speak with the detective whose name and badge number Burnett had provided to Naima at the scene, they were informed that no such officer was assigned to the 75th Precinct. It was only after NR's cousin produced an image captured earlier that night of Burnett inside 463 Livonia Avenue that officers at the precinct identified him as Detective Patrick Burnett.

61) Burnett and Alleyne would not face NR's family when they went to the precinct. The family was instead met by other NYPD personnel who provided business cards for Burnett and Alleyne but claimed that the two officers were unavailable because *they* were "upset." Before Naima could complete complaint paperwork, NR began to experience pain and trouble breathing.

62) NR was rushed to the Emergency Room at Brookdale Hospital, where she received treatment including x-rays of her knees and back. NR spent the night at the hospital, after which medical professionals referred her for follow-up treatment including psychiatric care and directed Naima to hold her out of school for several days.

63) NR's cousin remained at the 75th Precinct while Naima and NR went to the hospital. After hours of waiting, a supervising officer told him that Burnett and Alleyne had been looking for a runaway with severe mental health issues. The officer who provided this information to NR's cousin also showed him a photo of the woman in question, demonstrating both that NR looked nothing like the individual the police were looking for *and* that—at all times relevant—the police were in possession of evidence demonstrating as much.

64) Rather than attempt to apologize for the egregious actions of their subordinates or assist NR's cousin with the complaint process, the supervising officer instead complained that the police would now have to increase their efforts significantly to locate the woman they were *actually* looking for.

65) At approximately 1:15 AM on June 4th, as Naima watched over NR at the hospital, she received a call from a blocked number. The caller claimed to be a member of the NYPD and said that officers were on the way to the hospital to question Naima and NR.

66) Having just experienced a catastrophic breakdown in the reliance they were entitled to place in the police, both Naima and NR experienced substantial distress from this call, as they feared—and continue to fear—reprisals from the officers, or their colleagues, that had just assaulted, terrified, and humiliated NR in a public setting, without exhibiting a shred of remorse.

67) Although Naima and NR waited anxiously for further police contact while at the hospital, additional officers never arrived.

68) At approximately 3:45 PM on June 4th, NYPD Captain Brian D. Alexander—who was then-assigned to the 79th Precinct[8]—called Naima and claimed that he was investigating the previous night's events. When Naima's attorney contacted Alexander, he refused to identify himself and would not elaborate on his purported investigation.

69) Defendants Burnett and Alleynes' violation of NR's constitutional rights was not a one-off instance of NYPD misconduct, but rather the result of Department-wide policies and practices that permitted or, indeed, tacitly encouraged NYPD personnel to conduct unconstitutional stops and detentions and to use excessive or unnecessary force.

70) NYPD officers' widespread and persistent practice of affecting unconstitutional stops and detentions, and their use of excessive or unnecessary force, is so manifest as to imply indifference by the City and the NYPD's policy-making officials to such misconduct and its effect on the constitutional rights of citizens such as NR.

71) The NYPD, as an agency or subsidiary of Defendant City of New York, has declined and continues to fail to meaningfully address the obvious need to investigate, reprimand, sanction

---

[8] While Plaintiff does not currently possess information sufficient to explain why a Captain from the 79th Precinct was purportedly investigating an incident which occurred within the geographical boundaries of the 75th Precinct, upon information and belief, Defendant Burnett was previously assigned to the 79th Precinct.

and/or discipline officers who engage in unconstitutional misconduct, particularly unlawful

stops and detentions, and the use of excessive or unnecessary force.

72) The need for NYPD policymakers to implement legitimate remedial measures to address

these instances of constitutional misconduct has been made obvious through myriad

complaints and legal actions concerning such constitutional violations.

73) Prior federal litigation against the Defendant City directly addressed the NYPD's ongoing

pattern of unconstitutional stop, question and frisks, and concluded with a finding of liability

against the City in 2013, resulting in the installment of an external independent monitor (the

"External Monitor") tasked to "ensure that the NYPD's conduct of stops and frisks is carried

out in accordance with the Constitution…and to monitor the NYPD's compliance with the

ordered remedies."[9]

74) As of 2025, the NYPD has still not achieved or maintained the necessary level of compliance

to conclude the Floyd Court's jurisdiction over the matter, and the External Monitor tasked

with ensuring that the NYPD's conduct of stops is carried out in accordance with the

constitution has continued its reporting to the Court on the effort to instill constitutional

compliance within the NYPD.

75) On September 19, 2024, a report composed by former New York State Justice James Yates

for the External Monitor was filed with the Floyd Court, documenting in-depth findings

regarding the City's "[p]olicies, practices and procedures with respect to police misconduct

during stops."[10]

76) That report concluded in relevant part that:

> Discipline for illegal stops and frisks, even when substantiated by [the Civilian
> Complaint Review Board], is not pursued with the same vigor and resolve as for

---

[9] Floyd v. City of New York, 08-CV-01034 (AT), 959 F.Supp.2d 540, 563 (S.D.N.Y. 2013).
[10] Id., 08-CV-01034 (AT), ECF doc. no. 936, p. 1.

other misconduct. Penalties for wrongdoing involving stops, questions, frisks or searches of persons…even when repeated, are rare. Investigations and potentially useful data are not shared between agencies or departments as well as could be. And, various Police Commissioners, over time, have demonstrated an inordinate willingness to excuse illegal stops, frisks, and searches in the name of "good faith" or "lack of mal-intention," relegating Constitutional adherence to a lesser rung of discipline.[11]

77) Another report from the External Monitor, submitted to the Floyd Court on February 26, 2025, explicitly stated that "NYPD supervisors in the field and in commands are continuing to fail to identify unconstitutional stops, frisks, and searches"; that the NYPD's "compliance rates for self-initiated stops are extremely low…as opposed to when officers are responding to a radio run…"; and that "underreporting of stops continues to be a fundamental problem, making a true accounting of compliance impossible."[12]

78) Thus, the NYPD's pattern of constitutional violations in relation to stops and detentions is and has been ongoing, widespread, and persistent.

79) In September 2025, The New York City Comptroller's Office published research regarding civilian complaints of excessive or unnecessary force by members of the NYPD, suggesting a city-wide prevalence of excessive or unnecessary force violations by the NYPD.[13]

80) That report found that annual complaints made to the Civilian Complaint Review Board ("CCRB") of excessive or unnecessary use of force by the NYPD citywide rose by 49% between 2022 and 2023.[14]

---

[11] Id. at p. 2.
[12] Id., Doc. No. 953, at p.1.
[13] Richardson, J. et al., OFFICE OF COMPTROLLER OF NEW YORK CITY, BRAD LANDER, *Bureau of Policy and Research*, "A Blueprint for Department-Wide Restraint: An Analysis of NYPD Excessive Force Complaints, Claims, and Lawsuits", pgs. 4-5. (Sept. 22, 2025) (https://comptroller.nyc.gov/wp-content/uploads/documents/NYPD-Claims-Report-9.22.25.pdf)
[14] Id. at 4.

81) That report noted that in 2024, there were approximately 2000 CCRB complaints that included claims regarding NYPD's use of force.[15]

82) That report stated that in the past three years, the 75th Precinct was ranked as one of the top five precincts to have accrued the highest number of civilian complaints alleging excessive or unnecessary force by the NYPD.[16]

83) That report stated that since 2019, the City has settled at least 104 cases relating to complaints that alleged excessive or unnecessary force arising out of the 75th Precinct, reaching an aggregate total of over 9.8 million dollars.[17]

84) That report concluded that the City has not "adequately discouraged" this misconduct, even where the same officers or precincts are repeatedly involved in incidents that generate claims.[18]

85) Thus, the NYPD's pattern of constitutional violations in relation to excessive or unnecessary force is and has been ongoing, widespread, and persistent.

86) NYPD policymakers have been made aware of these obvious continuing patterns or customs of unconstitutional conduct by NYPD officers and have not taken meaningful action to prevent recurrence.

87) The NYPD has failed to adequately supervise its officers to prevent them from committing such unconstitutional actions, and the NYPD has failed to deter future misconduct by its officers through disciplinary action.

88) The NYPD's custom and practice of failing to meaningfully supervise or discipline officers who have engaged in constitutionally violative stops or detentions, and unlawful

---

[15] Id. at 12.
[16] Id. at 21.
[17] Id. at 21.
[18] Id. at 27.

use of excessive force, has effectively encouraged, condoned, and ratified such misconduct.

89) The NYPD's policy, practice, and custom of allowing its officers to commit constitutionally violative stops and detentions, and the use of excessive or unnecessary force without consequence, made it foreseeable to the Defendant City of New York that such misconduct would recur and affect the constitutional rights of citizens, which it did when Defendants Burnett and Alleyne committed such misconduct against NR.

90) NR's injuries are a direct and foreseeable result of the City's policy, custom or practice of allowing police officers to commit such unconstitutional misconduct.

91) To date, Infant Plaintiff NR continues to be affected by the conduct of the Defendants.

92) Before the events of June 3, 2025, NR was a "happy and outgoing" child and had no preexisting condition or history of mental injury.

93) NR now cries constantly, has trouble sleeping, and has experienced a marked loss of appetite. Naima has observed that her child is "bottled up," "doesn't want to go out at all," and some days does not even leave her bed. NR is now regularly seeing both a therapist and a psychiatrist because of the events of June 3, 2025, and is expected to begin a treatment of psychiatric medication to address her ongoing mental injuries.

94) While caring for NR in the aftermath of this incident, Naima Russell was forced to miss at least a month of work. As a result, Naima missed out on substantial earnings that she is unable to recoup.

95) NR now fears travelling outside of her home alone to reach the subway station and access public transit to travel to school, and is afraid that the same traumatic events might recur.

96) Both Naima and NR's trust in the NYPD, whose stated role is to "protect and serve" their community with "courtesy, professionalism, [and] respect," has been irreparably broken.

97) NR no longer feels any form of safety from the presence of the police, instead she fears future unprovoked violence and/or retaliation.

98) Naima can no longer trust that her child will be safe when simply stepping outside the confines of their apartment, and fears that NR will be subjected to further unprovoked violence at the hands of the police.

## CAUSES OF ACTION

99) With respect to each cause of action, Plaintiff incorporates by reference each paragraph of this Complaint.

## FIRST CAUSE OF ACTION

### State-Law False Arrest and False Imprisonment. All Defendants.

100) Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

101) The Individual Defendants intended to arrest and confine NR and curtailed her liberty by physically constraining her without legal justification.

102) The Individual Defendants stopped NR from traveling safely to her destination, forcibly restrained her, dragged her from the street into an unfamiliar building, and attempted to secrete her inside of an elevator.

103) At all times during this interaction before her release, NR could not voluntarily leave, as her movements were physically suppressed by the Individual Defendants, who intended to restrict her freedom.

104) The arrest and confinement of NR was not supported by any form of probable cause or reasonable suspicion, nor was it otherwise legally privileged.

105) NR had not committed a crime, violation or any unlawful conduct before being seized by the Individual Defendants.

106) NR's lawful conduct of simply walking down the street could not suggest any reasonable suspicion to the Individual Defendants or any law enforcement actor that a crime had been or was about to be committed.

107) NR was neither indicted nor charged with any crime or violation of the law at any time before, during or after her unlawful arrest and confinement.

108) NR was conscious of her confinement and did not consent to it.

109) NR's lack of consent was evidenced when she protested her confinement and cried out for help.

110) As a direct and proximate result of the Individual Defendants' unlawful actions, Plaintiff NR suffered and continues to suffer a loss of liberty, physical pain and mental anguish, emotional suffering, psychological trauma, shock, fright, apprehension, embarrassment and humiliation, for which she is entitled to compensatory and punitive damages.

111) By virtue of the foregoing, the Individual Defendants are liable to Plaintiff under New York common law.

112) Defendant City, as employer of the Individual Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

## SECOND CAUSE OF ACTION

### False Arrest and False Imprisonment Under 42 U.S.C. § 1983. Defendants Burnett and Alleyne.

113) Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

114) The Individual Defendants intended to confine NR and curtailed her liberty by physically constraining her without legal justification.

115) At no point did the Individual Defendants possess any legal justification recognized under federal or state law to believe that NR had committed a crime or could be permissibly detained or confined in such a manner, nor did the Individual Defendants possess any privilege to carry out a lawful arrest or detention of NR.

116) At all times during this interaction before her release, NR could not voluntarily leave, as her movements were physically suppressed by the Individual Defendants, who intended to restrict her freedom.

117) NR was conscious of her confinement and did not consent to it.

118) The Individual Defendants' seizure of NR constituted an arrest under the Fourth Amendment, as NR was not free to leave their captivity, as evidenced by the extraordinary degree of physical force they employed to unlawfully restrain and transport her from the street.

119) At the time of the incident, the Individual Defendants were acting under the color of law, pursuant to their employment as officers of the NYPD.

120) At the time of the incident, it was clearly established law that arresting or detaining an individual without probable cause violates the Fourth Amendment of the United States Constitution.

121) As a direct and proximate result of the unconstitutional actions of the Individual Defendants, NR suffered a loss of liberty, physical pain and mental anguish, emotional suffering, psychological trauma, shock, fright, apprehension, embarrassment and humiliation, for which she is entitled to compensatory and punitive damages.

122) By virtue of the foregoing, the Individual Defendants are liable to Plaintiff under 42 U.S.C. § 1983.

## THIRD CAUSE OF ACTION

### State Law Assault and Battery. All Defendants.

123) Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

124) The Individual Defendants assaulted NR when, through their intentional physical conduct, caused NR to imminently fear or apprehend harmful contact.

125) From the Individual Defendants' first encounter with NR in stopping her on the street, and throughout the entirety of the encounter with these defendants, NR was placed in continuing imminent apprehension of further, future harmful contact from the physical conduct of these Defendants as the interaction progressed.

126) The Individual Defendants battered NR, as both men made offensive, violent, and physically harmful bodily contact with the child, and did so plainly without the consent of NR.

127) As described *supra*, the Individual Defendants both individually made intentional physical bodily contact with NR's person in furtherance of their unlawful stop and detention of the child.

128) In light of the fact, among others, that NR was subjected to violent physical force entirely without provocation, legal justification or privilege, the bodily contact of the Individual Defendants against NR was intentional bodily contact that a reasonable person would find offensive.

129) The actions by the Individual Defendants were also objectively unreasonable within the meaning of N.Y. Penal Law § 35.30(1), given that NR—a physically small child—had not committed any crime, violation or other unlawful action to justify such use of force as described within the statute, and moreover did not resemble the person the Individual Defendants were ostensibly looking for, and repeatedly identified herself by name.

130) As a direct and proximate result of the Individual Defendants unlawful assault and battery, NR suffered a loss of liberty, physical pain and mental anguish, emotional suffering, psychological trauma, shock, fright, apprehension, embarrassment and humiliation, for which she is entitled to compensatory and punitive damages.

131) By virtue of the foregoing, the Individual Defendants are liable to Plaintiff under New York common law.

132) Defendant City, as employer of the Individual Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

### FOURTH CAUSE OF ACTION

**42 U.S.C. § 1983 Excessive Force in Violation of the Fourth Amendment. Defendants Burnett and Alleyne.**

133) Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

134) The Individual Defendants, acting under the color of law, applied extreme and inordinate physical force against NR and that application of force was unlawful.

135) At no point did the Individual Defendants have a legitimate legal basis for their excessive use of force against NR, who had not committed any crime, violation or other unlawful conduct. Indeed, NR repeatedly and explicitly informed these Defendants of her identity, which was not that of the subject these Defendants sought.

136) Accordingly, **no** amount of force used against NR by the Individual Defendants could have been objectively reasonable because the very detention of NR was baseless, illegal, and unsupported by even a cursory investigation.

137) Furthermore, Defendant Alleyne ignored NR's protestations that his illegal physical restraint was inhibiting her ability to breathe. Shortly after the incident, NR required medical attention because of the illegal assault perpetrated by the Individual Defendants.

138) The amount of force used during the battery of NR was inordinate and excessive, particularly given the physical size disparity between NR and the Individual Defendants, and that there was no basis to justify a seizure or detention of NR under any circumstances.

139) Given that NR had not committed any crime, violation or unlawful conduct, or provided any other possible reason to provoke such treatment from these officers, the conduct of the Individual Defendants was *per se* unreasonable within the meaning of New York's statute concerning the justification of law enforcement's use of force in the course of their duties under Penal Law § 35.30(1).

140) The Individual Defendants acted maliciously and in bad faith, as evinced by the total lack of justification or provocation for initiating such misconduct against NR; Defendant Burnett's act of "identifying" himself by providing a false name and badge number to Naima Russell; the abject failure of the Individual Defendants to offer any apology or regret surrounding their misconduct; and the fact that the Individual Defendants refused to reveal themselves to NR's family at the precinct and explain their actions.

141) As a direct and proximate result of the Individual Defendants unconstitutional use of excessive force against her, NR suffered a loss of liberty, physical pain and mental anguish,

emotional suffering, psychological trauma, shock, fright, apprehension, embarrassment and humiliation, for which she is entitled to compensatory and punitive damages.

142) By virtue of the foregoing, the Individual Defendants are liable to Plaintiff under 42 U.S.C. § 1983.

## FIFTH CAUSE OF ACTION

### State Law Negligent Infliction of Emotional Distress. All Defendants.

143) Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

144) The Individual Defendants had a duty to act with both a reasonable and a *heightened* degree of care toward the Infant NR, because under the same or similar circumstances a reasonable, prudent and careful person should have anticipated that emotional injury to NR would likely result from their gross misconduct.

145) Under the circumstances presented, the Individual Defendants owed a special duty of care to NR as a child whom they forcibly took into their custody under the apparent (but unreasonable) belief that she was a missing person or a runaway.

146) That special duty of care required the Individual Defendants to take reasonable, prudent steps to accurately identify NR to determine if she was in fact the individual sought before wrongfully accosting, accusing, and apprehending her; to ensure NR's safety while wrongfully in their custody; to not negligently impugn or disparage the character of NR to public spectators, and to take reasonable and prudent measures to ensure they were not negligently transporting NR to the private residence of a complete stranger.

147) No reasonable, prudent person seeking to return a missing or runaway person to their parent's home, particularly a law enforcement actor, would subject a child in their custody to

the use of violent force and accompanying public humiliation that the Individual Defendants did, without having confirmed the actual identity of the child in their custody.

148) No reasonable, prudent person seeking to return a missing or runaway person to their parent's home, particularly a law enforcement actor, would without any basis or provocation, publicly impugn a child as being a runaway, mentally ill, or a "liar", without having confirmed the actual identity of the child in their custody.

149) No reasonable, prudent person seeking to return a missing or runaway person to their parent's home, particularly a law enforcement actor, would attempt to forcefully transport a child to an individual at a private residence without having confirmed the actual identity of the child, or determining if such child resided at, or held any relationship with that address or individual before attempting to deliver them there.

150) The Individual Defendants' actions herein constitute a repugnant, gross breach of duty toward NR and a gross deviation from accepted professional standards.

151) The conduct of the Individual Defendants, in failing to identify the correct individual they were seeking before conducting an unwarranted, violent, and humiliating apprehension and transportation of a child in view of numerous onlookers, constituted extreme and outrageous conduct that unreasonably endangered NR's physical safety.

152) That Burnett negligently told a crowd of spectators that NR was "crazy"; that NR was "lying" and that they had correctly apprehended the right individual, when they had not confirmed NR's identity, and NR was in fact not the correct individual, was extreme and outrageous conduct.

153) That the Individual Defendants wrongfully determined NR was a runaway and then subjected her to a violent apprehension in view of public spectators negligently suggested to those spectators that NR was dangerous, a criminal, or some other wrongdoer.

154) As a result of the negligent conduct of the Individual Defendants, NR was endangered and reasonably expected to be further endangered upon being secreted away from public view and brought to the private residence of a complete stranger.

155) The grossly negligent conduct of the Individual Defendants resulted in significant emotional injury to NR, and that emotional injury was a direct result of the Individual Defendants' breach of their general and special duty owed to NR.

156) As a direct and proximate result of the Individual Defendants negligent infliction of emotional distress, NR suffered a loss of liberty, mental anguish, emotional suffering, psychological trauma, shock, fright, apprehension, embarrassment and humiliation, for which she is entitled to compensatory and punitive damages.

157) NR's injuries have manifested physically and mentally, as she has lost her appetite, lost her desire to be around others and has withdrawn from family and friends, exhibits fear and anxiety at the idea of traveling outside of her home, and feels fear and anxiety from the presence of police officers.

158) By virtue of the foregoing, the Individual Defendants are liable to Plaintiff under New York common law.

159) Defendant City, as employer of the Individual Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

## SIXTH CAUSE OF ACTION

**State Law Intentional Infliction of Emotional Distress. Defendants Burnett and Alleyne.**

160) Plaintiff repeats and realleges each allegation contained in the preceding paragraph as if fully set forth herein.

161) Plaintiff permissibly pleads in the alternative[19], for purposes of this cause of action, that the Individual Defendants intentionally inflicted emotional distress through their conduct against NR.

162) The Individual Defendants' unlawful, unprovoked, and unprivileged conduct against NR, in a public setting before a crowd of onlookers, constituted extreme and outrageous conduct.

163) Beyond the use of physical force by the Individual Defendants against NR, their actions also falsely portrayed NR as a criminal or mentally unwell person who was being placed under forcible arrest for an unidentified bad act, impugning her character and reputation before the crowd of onlookers.

164) Defendant Burnett informed the crowd of onlookers that NR was "crazy" and a "liar," further impugning her character and reputation.

165) Further, the actions of the Individual Defendants demonstrated to NR that they intended to confine her away from the public and deliver her to the private residence of an unknown stranger, and NR was justified in fearing further harm upon being brought before this stranger.

166) The actions of the Individual Defendants, who as stated herein, had absolutely no reason or justification to subject this child to such conduct, were so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and were atrocious and utterly intolerable in a civilized community.

---

[19] A "plaintiff is allowed to plead in the alternative." Breton v. City of New York, 404 F.Supp.3d 799, 814 (S.D.N.Y., 2019)(Koeltl, J.), citing Federal Rule of Civil Procedure 8(d).

167) No civilized community can tolerate circumstances where innocent children may not safely travel two blocks from home without the risk of being ripped from the street by large, unidentified, and armed men; dragged into a foreign building before a crowd of onlookers; and violently restrained on the purported basis of transporting said child to a stranger.

168) In committing such gravely offensive conduct against the innocent child and her guardian, the Individual Defendants acted with intent, or at minimum, a reckless disregard of the near-guaranteed likelihood of causing severe emotional distress to NR.

169) The Individual Defendants' actions and conduct against NR were the direct and proximate cause of Plaintiff's severe emotional distress.

170) NR has suffered and continues to suffer severe emotional distress as a result of the intentional actions of the Individual Defendants.

171) As a direct and proximate result of the Individual Defendants' intentional infliction of emotional distress, NR suffered a loss of liberty, mental anguish, emotional suffering, psychological trauma, shock, fright, apprehension, embarrassment and humiliation, for which she is entitled to compensatory and punitive damages.

172) By virtue of the foregoing, the Individual Defendants are liable to Plaintiff under New York common law.

## SEVENTH CAUSE OF ACTION

**Violations of Rights Under New York City Administrative Code § 8-802. All Defendants.**

173) Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

174) As described herein, the Individual Defendants violated NR's right to be free from unreasonable seizure, and to be free from the use of excessive force, as guaranteed by, among other authorities, New York City Administrative Code § 8-802.

175) The Individual Defendants, as employees of the NYPD are "covered individuals" as defined under New York City Administrative Code § 8-801, and NR is a "person aggrieved" as defined under that same authority.

176) Pursuant to Section 8-803 of the New York City Administrative Code, the Individual Defendants and their employer, Defendant City of New York, are liable to Plaintiff.

## EIGHTH CAUSE OF ACTION

**State Law Negligent Hiring, Training, and Supervision. Defendant City of New York.**

177) Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

178) Plaintiff permissibly pleads in the alternative, for purposes of this cause of action, that the Individual Defendants committed misconduct that fell outside the scope of their employment.

179) Said misconduct included, but is not limited to, the Individual Defendants seizing NR without probable cause for purposes unrelated to legitimate police activity sanctioned by the NYPD; Defendant Burnett providing false identifying information to conceal the Individual Defendants' misconduct from any disciplinary or remedial action; and Defendant Burnett providing false identifying information to prevent Plaintiff from accessing and exercising their rights to pursue legal remedy for the Individual Defendants' misconduct.

180) These acts were committed within the Individual Defendants' individual capacity, for personal reasons unrelated to legitimate law enforcement action, including but not limited to concealing their misconduct, and to secure promotions, raises, commendations or accolades.

27

181) Defendant City of New York knew, or should have known, the Individual Defendants had a propensity to commit such conduct, as the Individual Defendants had a documented history of police misconduct known to Defendant City, including conduct similar to the allegations in the instant complaint that was documented before the conduct complained of herein.

182) The Individual Defendants have been named in numerous complaints considered by the CCRB, and both have had one or more of those complaints substantiated against them.

183) The Individual Defendants have also been individually named as defendants in four or more lawsuits each, and some of those lawsuits have resulted in a monetary settlement.

184) The Individual Defendants are also both subjects of "disclosure letters" authored by the Kings County District Attorney's Office ("KCDA") documenting their disciplinary history.

185) Defendant Burnett has previously been the subject of a CCRB complaint that alleged he unlawfully assaulted a female detainee, which resulted in the CCRB recommending a further investigation into whether Burnett made false official statements to the investigatory panel as to how he incurred a fracture in his hand that appeared consistent with injuries to the detained woman's face. In a separate CCRB Complaint, Burnett was found to have failed to provide his identifying business card upon request.

186) During all times material to this complaint, Defendant City of New York, through its policymakers, owed a duty to the public at large and to Plaintiff which such policymakers knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs, and practices sufficient to prevent, deter, and avoid conduct by their subordinates in committing violations of the aforementioned constitutional rights of members of the public.

187) As a direct and proximate result of the City's negligence, NR suffered a loss of liberty, physical pain, mental anguish, emotional suffering, psychological trauma, shock, fright, apprehension, embarrassment and humiliation, for which she is entitled to compensatory and punitive damages.

188) By virtue of the foregoing, Defendant City of New York is liable to Plaintiff.

### NINTH CAUSE OF ACTION

**Monell** **Liability for Conduct of Employees of the NYPD. Defendant City of New York.**

189) Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

190) Under the principles of municipal liability for federal civil rights violations, the Commissioner of the NYPD has final authority and is the City's policymaker in the training, instruction, supervision, and discipline of NYPD officers.

191) As set forth above, the NYPD Police Commissioner, personally and/or through their authorized delegates, at all relevant times had final authority, and constituted a City policymaker for the NYPD whom the City is liable with respect to such conduct.

192) At the time of NR's unconstitutional stop, detention, and battery at the hands of Defendants Burnett and Alleyne, the NYPD had a longstanding custom and practice of conducting unconstitutional stops and detentions of citizens, and the unconstitutional use of excessive or unnecessary force.

193) This custom and practice of NYPD officers was so widespread and persistent that City policymakers were and continue to be aware of this routine misconduct and have constructively acquiesced to its continued occurrence.

194) The Individual Defendants acted in accordance with this longstanding NYPD practice and custom when they unconstitutionally stopped, detained, assaulted, and battered NR without any legal privilege or justification.

195) At the time of NR's unconstitutional detention and physical battery, the NYPD also had a custom and practice to not meaningfully internally investigate, reprimand, sanction or discipline officers to prevent recurrence of such unconstitutional misconduct.

196) This custom and practice encouraged, condoned and ratified the deliberate and reckless violations of the constitutional rights of citizens by subordinate of the NYPD.

197) In the years before the NYPD's violation of NR's constitutional rights and up through the present day, the NYPD has had an extensive history of misconduct that caused constitutional violations, particularly with respect to unconstitutional stops, detentions and use of excessive force against citizens.

198) Policymakers at the NYPD, acting with deliberate indifference to these constitutional violations, including those that injured Plaintiff NR, failed to take any meaningful steps to protect against constitutional harm that was occurring and likely to occur without implementing policies, practices, or procedures in place to prevent, address, or punish such misconduct.

199) To the contrary, the deliberate indifference of the NYPD policymakers, including the Commissioner and her designees, to constitutional violations such as those affected against NR created a culture of misconduct that said policymakers knew was highly likely to result in further violations, which, in fact, did so in numerous cases, including NR's.

200) NYPD policymakers were and continue to be aware of this unconstitutional misconduct by NYPD officers by way of a number of complaints and lawsuits claiming factually similar

unconstitutional stops and detentions, and use of excessive force. Despite this awareness, the NYPD has continuously failed to meaningfully address such misconduct.

201) The Individual Defendants acted in accordance with these NYPD practices, policies and customs when they, without fear of reprisal or discipline, unconstitutionally stopped and detained NR, and subjected her to unlawfully excessive force as set forth *supra*.

202) These unlawful policies, practices, procedures, and customs of the Defendant City were a substantial factor in bringing about the violations of NR's rights under the Constitution and laws of the United States.

203) By virtue of the foregoing, Defendant City of New York is liable to Plaintiff.

**WHEREFORE,** Plaintiff demands judgment against the Defendants as follows:

    a. Compensatory damages in an amount to be determined at trial;

    b. Economic damages in an amount to be determined at trial;

    c. Punitive damages in an amount to be determined at trial;

    d. Damages for legal fees in an amount to be determined at trial;

    e. Reasonable attorneys' fees, together with costs and disbursements, under 42 U.S.C. 1988 and the inherent powers of this Court;

    f. Pre-judgment interest as allowed by law; and

    g. Such other and further relief as this Court may deem to be just and proper.

**Dated:** October 27, 2025
Brooklyn, New York

Respectfully submitted by

James D. Henning, Esq.
Law Offices of James Henning & Associates, PLLC
Attorneys for Plaintiff
16 Court Street, Suite 503
Brooklyn, NY 11241
Jhenning@jhenninglaw.com
718-717-2454

31

## VERIFICATION

NAIMA RUSSELL, having first been duly sworn, deposes and says:

I am the legal guardian of "NR," the Infant Plaintiff in the above-entitled action. I have read the foregoing Complaint and know the contents thereof. The same are true to my knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true.

NAIMA RUSSELL

Sworn to before me this 27th day of October 2025

Notary Public

FINN MAYOCK
STATE
OF NEW YORK
NOTARY PUBLIC
Qualified in Kings County
02MA0034854
MY COMMISSION EXPIRES 03/14/2029

32